WATKINS, Judge.
This is an action for a declaratory judgment to declare an act of sale of a mobile home null and void, and to declare plaintiff owner of the mobile home. Defendant has reconvened seeking a declaratory judgment that the act of sale in question is valid and ordering the delivery of the certificate of title to the mobile home in question to defendant.
It appears that plaintiff held a chattel mortgage on a Corsicana house trailer, model 24 X 60, 1972, bearing serial number 4-60-1203. The certificate of title (introduced as Exhibit P-1) issued by the Louisiana Department of Public Safety shows the owners of the mobile home to be John W. Dowty and Mattie R. Dowty. The Dowtys abandoned the mobile home, which was located near Boyce, Louisiana. Neal Delloco-no, an employee of Gulf Union Corporation, which is the servicing agent for plaintiff on its loans, found out that the mobile home had been abandoned by the Dowtys. Following Gulf Union’s usual procedure, Gulf Union contacted several mobile home dealers, who saw the trailer. Only one, Steve Allen, d/b/a AA Mobile Homes, made a bid. Allen’s mobile home lot was on the Airline Highway in Baton Rouge. Gulf Union accepted Allen’s bid. Allen had dealt with Gulf Union before, and had bought three or four mobile homes from plaintiff. The usual procedure with Allen and all other mobile home dealers was for the mobile home to remain on the site on which it was abandoned until the bid was submitted and accepted. This procedure was followed in the present case. Allen would then haul the mobile home out or leave it on the site, and bring a certified check. Title would then be released to Allen. Allen had always paid in the past.
Plaintiff alleges in its petition, and defendant admits in its answer, that the mortgagees acquired the mobile home as a result of a release signed by the mortgagors (the Dowtys). This release was never introduced in evidence, although plaintiff introduced an Affidavit of Possession of Motor Vehicle by Mortgagee, which was signed by Alan J. Weitz, Trustee, beneath the typed words “YORKWOOD SAVINGS AND *1267 LOAN ASSOCIATION”, as Exhibit P-2. This affidavit indicates that plaintiff had taken possession of the mobile home in question on June 8, 1977, and had obtained a voluntary surrender form signed by the mortgagors.
Gulf Union, following its usual practice, then prepared what is known as a “Pickup Order”. This pickup order, which was introduced as Exhibit Hardison-1, was dated “1-21-77”. (Why the date of the pickup order precedes the date of repossession given in the affidavit of possession is not explained in the record or briefs, but this problem is not at issue here.) The pickup order was addressed to Steve Allen, and asked him to pick up the mobile home in question. A map was attached which indicated that the mobile home was located near Hot Wells, Louisiana. As was the usual procedure, no funds were paid out prior to the pickup order’s going out.
Allen was contacted about picking up the mobile home in January of 1977 according to Dellocono’s testimony. Allen did not, and gave various excuses or reasons for not doing so. At the beginning of June, Allen said he was ready to buy the mobile home. The back of the certificate of title was endorsed in blank by Alan J. Weitz as trustee before a notary public, whose signature is illegible. All the papers of sale were prepared. Allen came by Gulf Union without the money, so Allen was never given a bill of sale. Gulf Union at all times had and retained possession of the certificate of title on the mobile home.
Charles Hardison, president of defendant corporation, which had a lot at Golden Meadow, Louisiana, on which twenty mobile homes were located, but which used the mobile homes for various purposes and was not a dealer, was contacted by Allen by telephone. Allen had heard that Hardison was looking for a mobile home. Allen told Hardison that he had several mobile homes on his lot. Hardison drove to Allen’s lot in Baton Rouge, and did not find any mobile homes that he liked. Allen told him that he had another trailer at Boyce. Allen, Allen’s wife or girlfriend, Hardison, and Grace Hodges, bookkeeper for defendant corporation, drove to Boyce in the same car, went farther out into the country, and Hardison looked at the mobile home in question, which, after some discussion on the way back to Baton Rouge, Hardison agreed to buy. A bill of sale (introduced as Hardi-son-2) was prepared, which was signed by Allen and Hardison on behalf of defendant. The bill is dated “2-3-77” and the purchase price is given as $8,350.00, including sales tax. Gulf Union, as has been stated, had possession of the certificate of title. Hardi-son never asked Allen for documents which indicated Allen owned the mobile home. Hardison took it for granted that Allen owned the mobile home.
Some work needed to be done on the mobile home, which was in bad condition. It was agreed that Hardison would not pay Allen for the trailer until the work was completed and the mobile home hauled down to Hardison’s lot. Hardison on behalf of defendant issued a check (introduced as Hardison-3) dated “February 18, 1977”, for $6,500.00 when the trailer was delivered and part of the work completed. A second check in the amount of $950.00 (introduced as Hardison-4), dated “3-15-77”, was issued when the work was completed, marked in the same handwriting as that of the signer “Paid in Fulll” (sic). (The two checks did not make up the full sales price because a third check, introduced as Hardi-son-5, was issued by defendant for carpeting, dated “Feb. 23, 1977”, payable to the order of U. S. Rushing & Son, in the amount of $816.78).
Defendant corporation appears still to be in physical possession of the trailer. Allen has absconded with the money. Delloeono found out about the purported sale from Allen to defendant from Harry Lilly, who had a mobile home lot next to Allen’s lot, in September or October of 1977. The present suit was then filed.
The trial court held that the purported sale from Allen to defendant was null and void, declared plaintiff the owner of the mobile home, and dismissed defendant’s re-conventional demand, all costs to be borne by defendant. We affirm.
The Motor Vehicle Certificate of Title Law (La.R.S. 32:701 et seq.) applies. The *1268 Motor Vehicle Certificate of Title Law applies not only to the sale and mortgaging of motor vehicles but to the sale and mortgaging of all vehicles which must be licensed under Chapter 4 of Subtitle II of Title 47 of the Louisiana Revised Statutes of 1950,” which Chapter and Subtitle specifically include trailers (see La.R.S. 47:462). With certain specific exceptions not here pertinent, no purchaser has a marketable title to a vehicle unless he has a certificate of title to the vehicle. Neither Allen nor defendant corporation had or has a certificate of title. The certificate of title was at all times in the possession of Gulf Union. Hence, we hold that defendant does not have title or marketable title, and that the purported act of sale from Allen to defendant was null and void. In view of the fact that the mortgagors, the Dowtys, are alleged by plaintiff and admitted by defendant to have released the mobile home to plaintiff, plaintiff must be considered the owner of the mobile home.
It is true that a judicial exception to the Motor Vehicle Certificate of Title Law may have been created by two cases, Flatte v. Nichols, 233 La. 171, 96 So.2d 477 (1957) and Gomez v. Security Insurance Co. of Hartford, 314 So.2d 747 (La.App.4th Cir. 1975), which are based upon the doctrine of estop-pel. However, these cases differ from the present case in the factual situations presented.
In Flatte, one Carley bought a car from Cargile Motor Company in Texarkana, Arkansas, acquired a manufacturer’s certificate, and immediately applied for a Texas title certificate. Carley sold the car to plaintiff, a Texas dealer, and delivered the receipt for a Texas license, this being the only muniment of title that Carley possessed. Plaintiff then delivered the car personally to Murphy, a dealer in Cleveland, Mississippi, with whom plaintiff had previously done business. Plaintiff gave Murphy the title papers he had received from Car-ley, and gave Murphy an invoice of sale, signed by plaintiff’s bookkeeper and notarized by plaintiff, which indicated that the sale was for “cash”. The purchase price was paid by check. The check was refused, for insufficient funds. Plaintiff knew that Murphy was a dealer, and would resell the car. Mississippi at the time had no motor vehicle certificate of title law. Before the check was .ultimately refused, Murphy resold the car to defendant, delivering the documents Carley had delivered to plaintiff, the invoice signed by plaintiff, and the mu-niments of title in Mississippi. After the sale from Murphy to defendant the Texas certificate of title was issued and delivered to plaintiff. Defendant later resold the car, but this sale did not affect the result. Plaintiff sued defendant for the return of the car or its value. Defendant pleaded estoppel. The Louisiana Supreme Court held that plaintiff could not recover because he was estopped from doing so. It stated: “It is settled jurisprudence that where one of two innocent parties must suffer loss through the fraud of another, the burden of the loss should be imposed on him who most contributed to it.” (96 So.2d. 477, 480).
In the present case, unlike Flatte, the plaintiff never entered into an act of sale with the intermediary (in this case Allen, in the Flatte case Murphy). The most that plaintiff or Gulf Union in the present case ever executed was a pickup order, which was executed by Gulf Union, and which was not an act of sale. In Flatte, the plaintiff’s bookkeeper executed, and plaintiff notarized, an invoice of sale. Furthermore, in Flatte, the intermediary Murphy, delivered the invoice of sale to the defendant. In the present case, Allen did not deliver, or even show to defendant, the pickup order, which was not an act of sale, nor did he show to defendant any papers that would indicate that, title to the mobile home had been delivered to Allen. There were none, as we have stated.
In Gomez, if plaintiff, Gomez’s, version of the facts is correct, one Rigger came to plaintiff’s house, accompanied by a person identified as a mechanic, in response to a newspaper advertisement offering for sale a car owned by plaintiff. Plaintiff, Rigger, and the “mechanic” took a test ride. Rigger indicated he was interested in buying the car, asked to see the title certificate as a protection against liens, and wrote a check for $1,250.00. Plaintiff showed Rigger the title certificate but refused the *1269 check, stating that he preferred to wait until the weekend was over to close the transaction. Rigger asked permission to show the car to another mechanic and left but never returned. Unknown to plaintiff, Rigger had taken the title certificate, which was endorsed in blank, and left the check. Plaintiff called the police, who informed plaintiff that they could take no action until the check was refused. On Monday morning, plaintiff learned that the check was drawn on an account Rigger had set up an hour before plaintiff saw him with a deposit of $25.00. The car was found in a used car lot, but Rigger had disappeared. Rigger had sold the car for $600.00 to the dealer. Rigger had delivered the certificate of title, endorsed, to the dealer and given him a bill of sale. Upon payment of the sum of $600.00, plaintiff recovered the car. The car was insured against theft by defendant. When defendant refused plaintiff’s claim for $600.00, plaintiff filed suit, and defendant filed a third party petition against the used car dealer under the subro-gation clause of the policy.' The Court of Appeal concluded that indeed a theft had occurred, and rendered judgment for plaintiff on the principal demand. It, however, denied defendant’s third party demand against the used car dealer, stating that of the two innocent parties plaintiff, not the used car dealer, was the more blameworthy, as plaintiff had consented to Rigger’s obtaining temporary possession of the car and had allowed him whether voluntarily or involuntarily, to obtain the certificate of title endorsed in blank. Citing Flatte, it said that plaintiff’s subrogee, the insurer, must bear the loss.
If this case constitutes an exception to the provisions of the Motor Vehicle Certificate of Title Law in looking to the equities as well as to the certificate of title, it should be borne in mind that the used car dealer in Gomez was delivered the certificate of title, endorsed in blank. The ease thus rests in part on the Motor Vehicle Certificate of Title Law. In the present case, Gulf Union, plaintiff’s servicing company, at all times had possession of the certificate of title. Allen never had the certificate of title. Furthermore, Gomez’s negligence in permitting Rigger to obtain temporary possession of the car far surpasses any possible negligence on the part of Yorkwood and Gulf Union.
We therefore, conclude that the doctrine of estoppel, if .it indeed constitutes an exception judicially created to the Motor Vehicle Certificate of Title Law, does not apply in the present case.
A third case, cited by defendant in its brief, Port Finance Co. v. Ber, 45 So.2d 404 (Orl.La.App.1950), is not in point, as it involves a sale of an automobile which took place on May 6, 1948, before the Louisiana Motor Vehicle Certificate of Title Law was enacted .(see Louisiana Act No. 342 of 1950).
There is nothing in the factual situation presented in the present case that would suggest that Allen or AA Mobile Homes was ever an agent of Yorkwood or Gulf Union for the sale of the mobile home.
Judgment of the trial court is affirmed, all costs of the trial court and this appeal to be borne by defendant.
AFFIRMED.